**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **MICHAEL G. MEDINA #332874,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) **No. 2:16-cv-00019** |
| **v.** | ) |
| | ) **Chief Judge Sharp** |
| **KEVIN GENOVESE,** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM

Petitioner Michael Medina, a state prisoner serving a sentence of life with the possibility of parole for the first degree murder of his estranged wife, has filed a *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus. (ECF No. 1.)  Respondent has filed an answer, along with a copy of portions of the state court record. (ECF Nos. 15, 19, 20.)  For the reasons set forth below, the petition will be denied.

## I.      BACKGROUND AND PROCEDURAL HISTORY

A Smith County jury convicted Petitioner on April 12, 2001, of premeditated first degree murder. (ECF No. 15-1, at 15.).  The trial court imposed a life sentence. (ECF No. 15-1, at 15.) Petitioner appealed, challenging the sufficiency of the evidence of premeditation and a ruling by the trial court that allegedly forced him to make a premature election about whether to testify at trial. (ECF No. 15-8, at 2.)  The Tennessee Court of Criminal Appeals (TCCA) affirmed, and the Tennessee Supreme Court denied permission to appeal. *State v. Medina*, No. M2001-02412-CCA-R3-CD, 2002 WL 31188186 (Tenn. Ct. Crim. App. Oct. 2, 2002), *app. denied* (Tenn. Jan. 27, 2003).

On September 29, 2003, Petitioner filed a *pro se* petition for post-conviction relief, which was followed by the appointment of counsel and the filing of two amended petitions, the last of

which was filed on October 16, 2013.[1] (ECF No. 15-14, at 5, 54, 57.) The post-conviction court held a hearing on January 10, 2014, and entered an order denying relief on February 12, 2014. (ECF No. 15-14, at 97.) Petitioner limited his appeal to several claims of ineffective-assistance of trial counsel. (ECF No. 15-18, at 14–17.) The TCCA affirmed the denial of relief, and the Tennessee Supreme Court denied permission to appeal on December 11, 2015. *Medina v. State*, No. M2014-00561-CCA-R3-PC, 2015 WL 5169318 (Tenn. Ct. Crim. App. Sept. 2, 2015), *app. denied* (Tenn. Dec. 11, 2015).

Petitioner filed his *pro se* habeas corpus petition in this Court by delivering it to the prison mail room on March 9, 2016. (ECF No. 1, at 64.) Respondent does not dispute that the petition was timely. (ECF No. 20, at 2.) Respondent filed an answer to the petition on June 13, 2016, and has filed portions of the state court record. (ECF Nos. 15, 19, 20.)

## II.    MOTION TO EXPAND THE RECORD

Petitioner has also filed a motion to expand the record in this matter (ECF No. 23), which Respondent opposes. (ECF No. 28.) With his motion, Petitioner has submitted 220 pages of correspondence with his trial and post-conviction counsel. (ECF No. 23-1–23-6.) He also asks that dozens of additional documents be added to the record by Respondent, including investigative records, subpoenas, and court records related to appointment and withdrawal of previous counsel and his efforts to compel counsel to take certain actions during post-conviction proceedings. (ECF No. 23, at 8–10.)

Petitioner does not identify specific claims to which these documents relate, but states generally that they pertain to "issues that are allegedly waived or considered defaulted," and that they "will substantiate Petitioner['s] claim that he diligently and specifically requested each and every Post Conviction Attorney to subpoena numerous witnesses needed for the Post

---

[1] In the interim, the post-conviction proceedings were delayed by multiple substitutions of counsel for Petitioner, the death of the original trial judge and transfer of the case to another court by interchange due to a judicial conflict, and multiple *pro se* motions by Petitioner for extraordinary relief and writs to the appellate courts, all of which were denied. (ECF No. 15-14, at 97–100.)

Conviction Hearing in order to have them present to in [sic] court to have them testify regarding the issues raised." (ECF No. 23, at 3, 4.)  However, evidence in a federal habeas proceeding of ineffective assistance of post-conviction counsel is only relevant in one very limited circumstance: to establish cause to excuse the default at the post-conviction initial review stage of a claim for ineffective assistance of trial counsel. *Martinez v. Ryan*, 132 S.Ct. 1309 (2012). Petitioner has not alleged that any of his claims were defaulted at post-conviction initial review – as opposed to post-conviction appeal – and *Martinez* does not authorize the retrial with new evidence of claims that were rejected on the merits by the post-conviction trial court.

As fully addressed below, each of the claims Petitioner raised in the post-conviction trial court was denied on the merits and either went on to be fully exhausted or was defaulted on appeal.  For the exhausted claims, consideration of any evidence beyond the state court record is prohibited. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011).  And for claims defaulted on post-conviction appeal, admission of new evidence would be futile, because Petitioner has not demonstrated cause for default at that stage.  Even where a petitioner alleges that attorney error caused a claim to be denied on initial collateral review, *Martinez* does not apply because "[e]ven if the post-conviction trial court had ruled erroneously, and its error were traceable directly to counsel's deficient advocacy, the . . . claim would not have been *procedurally defaulted* at the post-conviction trial proceeding because [Petitioner] retained the right to preserve the claim by appealing." *West v. Carpenter*, 790 F.3d at 699 (emphasis in original). Under such circumstances, allegations that post-conviction appellate counsel was ineffective in failing to raise claims on appeal are also to no avail: "Ineffective assistance of counsel at this stage of the case cannot constitute cause to excuse the procedural default because it is not an *initial-review* collateral proceeding." *Wallace v. Sexton*, 570 F. App'x 443, 453 (6th Cir. 2014) (emphasis in original).

Accordingly, Petitioner's motion to expand the record will be denied.  To the extent the

record filed by Respondent has omitted any evidence that was properly part of the state court record and relevant to Petitioner's surviving claims, those omissions are addressed in the analysis below.

## III.    STATEMENT OF FACTS

The TCCA summarized the facts of the case as follows:

On September 26, 1999, Jennifer Medina was found in the home she had shared with the Appellant, lying in a pool of blood with a fatal gunshot wound to the head. The autopsy report and physical evidence established that death was produced by a 9 mm gunshot wound, with the gun's barrel touching her head when the gun was fired. The Appellant, the estranged husband of the victim and present at the scene, was charged with the homicide.

The parties were married in 1991 and had one child, who was two years old. The child, Austin, had been diagnosed with cancer and, during this time, was undergoing chemotherapy treatments at Vanderbilt Hospital in Nashville, in addition to receiving intravenous medication at home. By 1999, the marriage had seriously deteriorated, and the Appellant had filed for divorce. After the divorce was filed, the victim resided with her best friend and next-door neighbor, Ellen Newman. The Appellant continued to reside in the marital residence with his minor children from a prior marriage. The parties agreed to a temporary order, which provided for shared custody of Austin. The divorce action was characterized as hostile and bitter, as were the ensuing temporary custody battles.

On August 20, 1999, an order of protection was issued against the Appellant, based upon a finding of domestic abuse after the Appellant refused to comply with the terms of the temporary custody agreement. On this occasion, the victim was thrown against a wall by the Appellant and sustained bruises and a knot on her head.

Also in August 1999, the victim contacted Crime Stoppers in Franklin, Tennessee, and reported that the Appellant had stolen a "bobcat" loader in June 1997. She provided details of how the theft occurred, how the Appellant had repainted it and removed the serial numbers, and to whom it was sold. The Appellant was contacted by a detective, and he claimed that the victim was manufacturing the charges because he had been given custody of their child. The details provided by the victim were subsequently verified by the police, and the Appellant was arrested on August 26th for the theft. The victim would have been a material witness in the case.

After the arrangements under two joint custody orders had failed, temporary custody of the minor child and child support were awarded to the victim on September 10, 1999. The order provided the Appellant visitation on Monday through Thursday from 5:00 p.m. to 6:30 p.m. and every other weekend from Friday at 5:00 p.m. to Sunday at 5:00 p .m. The Appellant was permitted to retain possession of the marital residence, and the victim was responsible for delivering

the child to and from the residence during the Appellant's visitation periods. FN1

Footnote 1

The order also set aside a quitclaim deed the victim had executed conveying her interest in the marital property, the court finding the deed had been executed under duress.

At approximately 5:00 p.m. on the day of her death, FN2 the victim left the Newman residence on foot to go and retrieve Austin from his father following visitation. It was the victim's normal practice to remain outside the residence when picking up her son. Before leaving, the victim told Ellen Newman that she would be back in five minutes. She carried no purse or bags with her.

Footnote 2

This date was a Sunday and was also the victim's twenty-seventh birthday.

Approximately two and one-half hours later, a 911 call was made from the marital residence. When officers responded to the call, they found the Appellant outside with Austin in his arms. Upon entering the residence, deputies found the victim lying on the floor with a gunshot wound to the head. A .38 caliber revolver was found near her head and a 9mm semi-automatic handgun was found near her knee. The serial number on the .38 revolver was removed and no identifiable fingerprints were found on either weapon. The .38 caliber revolver was fully loaded and had not been fired. A 9 mm shell casing was found on the floor in the kitchen area and a 9 mm projectile was removed from the floor, where it was embedded.

The Appellant was taken into custody and subsequently gave a statement to Tennessee Bureau of Investigation Agent Jason Locke. The Appellant stated that the victim had brought the .38 revolver with her into the house and then refused to leave. He claimed that she wanted to talk about reconciling. The Appellant also stated that he was afraid of her as she was hysterical at times. FN3 He stated that, after he saw her with the gun, he retrieved his 9 mm pistol from the safe in the bedroom. He explained that he put the gun in his back pocket so that the victim would not see it. During this period, the victim remained in the living room of the house. The Appellant stated that an argument ensued and "she kept pointing the gun at me.... I turned around and she was right in front of me. And I couldn't see the gun any more, she was just too close to me, I didn't know where it was, and I grabbed her and I pushed her. We hit the ground, and all three of us hit together." When the victim fell, he heard a gunshot. The Appellant denied shooting the victim. During the scuffle, the Appellant maintained that his pistol remained in his back pocket and he offered no explanation as to how his pistol shot the victim.

Footnote 3

The post-mortem examination revealed that the twenty-seven-year-old victim was sixty-four inches tall and weighed ninety-two pounds.

Several witnesses testified that the victim did not own a gun. No one saw her entering the residence with a gun that day, including the Appellant's three sons

from a prior marriage who were present outside the house when she arrived. FN4 Several witnesses also testified that the victim had no plans to reconcile with the Appellant. The victim's father testified that she and Austin had in fact planned to move to Illinois and live with him after the divorce.

> Footnote 4
>
> Joe Medina, the Appellant's twelve-year-old son, did testify at trial that he went to the door while the victim was inside and saw her holding a gun at that point. However, on cross-examination, the son admitted that in his initial statement to the investigator, he did not indicate that he had seen the victim with a gun. The son also admitted that the Appellant had told him what happened and left notes to him describing what had happened.

At trial, the State argued that the Appellant had lured the victim into the residence on this date, had shot her in the head, and then planted the .38 pistol by her body. On April 12, 2001, the Appellant was found guilty by a jury of first-degree premeditated murder. This appeal follows.

*State v. Medina*, No. M2001-02412-CCA-R3CD, 2002 WL 31188186, at *1-2 (Tenn. Ct. Crim. App. Oct. 2, 2002).

## IV.   ISSUES PRESENTED FOR REVIEW

In his 64-page petition, Petitioner raises 19 claims for relief, many of which involve the alleged ineffective assistance of counsel, and some of which appear to overlap or be redundant of one another.  Respondent has helpfully organized all of Petitioner's claims into 6 issues, and for ease of reference and analysis the Court will adopt Respondent's structure as follows:

1. Trial counsel rendered ineffective assistance of counsel. (Petitioner's grounds 1–3, 5, 8, 11–19.)

2. The trial court did not instruct the jury regarding the burden of proof. (Petitioner's ground 4.)

3. The State failed to preserve gunshot residue evidence on the victim's hands. (Petitioner's ground 6.)

4. Appellate counsel rendered ineffective assistance of counsel. (Petitioner's grounds 7 and 19.)

5. The trial judge committed judicial misconduct. (Petitioner's ground 9.)

6. The prosecutor committed prosecutorial misconduct. (Petitioner's grounds 9 and 10.)

## V.     STANDARD OF REVIEW

### A.     AEDPA Review on the Merits

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a).  Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).  Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court concludes that the decision is erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)).

Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

By its express terms, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding, including instances where the state court rules against the petitioner in a summary opinion that rejects all claims without discussion, or an opinion that addresses some claims but does not expressly address all the federal claims presented. *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013); *Harrington v. Richter*, 562 U.S. at 98–99; *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). Where a claim has not been adjudicated on the merits in state court but is still subject to federal review despite the bars of exhaustion and default, "federal habeas review is not subject to the deferential standard that applies under AEDPA. . . . Instead, the claim is reviewed *de novo*." *Moritz v. Lafler*, 525 F. App'x 277, 282 (6th Cir. 2013) (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)); *accord Bies v. Sheldon*, 775 F.3d 386, 395–96 (6th Cir. 2014) ("Because Bies' *Brady* claim was never 'adjudicated on the merits in State court proceedings,' the limitations imposed by § 2254(d) do not apply, and we review the claim de novo.").

## B.     Exhaustion and Procedural Default

### 1.     *Exhaustion*

28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas

corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. at 182.  The petitioner must "fairly present"[2] each claim at all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in that court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003), *cert. denied*, 541 U.S. 956 (2004); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("*Adams* not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims ... but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).  Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim. *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009).  For the claim to be exhausted,

---

[2] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

it must be presented to the state courts as a federal constitutional issue, not merely as an issue arising under state law. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). Specifically, in determining whether a petitioner "fairly presented" a federal constitutional claim to the state courts, federal courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) relied upon federal cases employing the constitutional analysis in question; 3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the pertinent] constitutional law." *Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Moreover, the claim must be presented to the state courts under the same legal theory in which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). It cannot rest on a legal theory that is separate and distinct from the one previously considered and rejected in state court. *Id.* This does not mean that the applicant must recite "chapter and verse" of constitutional law, but the applicant is required to make a specific showing of the alleged claim. *Wagner*, 581 F.3d at 414.

### 2. *Procedural Default*

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and

adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same).[3]  If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32; *see also Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754).

A petitioner seeking to overcome procedural default must establish prejudice as well as cause. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default").  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).  Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

---

[3] "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule ... can serve as an adequate ground to bar federal habeas review ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* at 1128 (quoting *Kindler*, 558 U.S. at 60–61) (internal citations & quotation marks omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495–96); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## VI.    ANALYSIS AND DISCUSSION

### A.    Claim 1

Claim 1 consolidates all of Petitioner's allegations of ineffective assistance of trial counsel. All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. In assessing counsel's performance, a reviewing court must be highly deferential and avoid the "second-guess[ing of] counsel's assistance . . . , [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The court must determine whether, under the circumstances, counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690. In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).

The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

As discussed above, however, federal habeas relief may not be granted on an exhausted claim under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

### 1. Defaulted Claims

As discussed above, any claim that is not fully exhausted in state court is deemed procedurally defaulted and may not be heard in a federal habeas action. This includes claims that are raised in a trial-court-level post-conviction action, but are not raised as issues on appeal from the denial of post-conviction relief. *Wallace v. Sexton*, 570 F. App'x 443, 453 (6th Cir. 2014); *Nesser v. Wolfe*, 370 F. App'x 665, 670 (6th Cir. 2010). Petitioner's following ineffective-assistance-of-trial-counsel claims fall into this category: Petitioner's Ground 2 (claim related to voir dire); Petitioner's Ground 12 (claim related to emergency medical personnel reports); Petitioner's Ground 14 (claim related to securing crime scene photos); Petitioner's Ground 16 (claim related to cross-examination of medical examiner); Petitioner's Ground 18 (claim related to use to preliminary hearing testimony to impeach trial witnesses); and portions of Petitioner's Ground 19 (claims related to keeping Petitioner informed about his case and having witnesses available and ready to testify in the courthouse).

Petitioner asserts that each of these claims was presented in trial-level post-conviction proceedings. (ECF No. 1, at 9 (Ground 2), 34–35 (Ground 12),[4] 41–42 (Ground 14), 46–47 (Ground 16), 51–52 (Ground 18), 54–55 (Ground 19).) But he did not raise them in his brief on appeal from the denial of post-conviction relief.[5] (ECF No. 15–18.) Although Petitioner argues with respect to each of these claims that his appointed counsel handling the post-conviction appeal did not communicate with him before filing the brief and unilaterally failed to raise some of his claims (e.g., ECF No. 1, at 11), "attorney error at state post-conviction appellate proceedings cannot excuse procedural default." *Atkins v. Holloway*, 792 F.3d 654, 661 (6th Cir. 2015) (quoting *West v. Carpenter*, 790 F.3d 693, 699 (6th Cir. 2015)).

Petitioner also complains at length that his counsel for the trial-level post-conviction hearing failed to handle these claims properly. (E.g., ECF No. 1, at 10–11.) Even construing this contention as an argument that post-conviction counsel's ineffectiveness constitutes cause for default under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), that argument fails. Despite any alleged inadequacy in post-conviction counsel's presentation of these claims, the state court considered and denied them on their merits without finding that any of them had been waived or defaulted. (ECF No. 15-14, at 10–11.) As previously mentioned, *Martinez* does not apply in such circumstances because "[e]ven if the post-conviction trial court had ruled erroneously, and its error were traceable directly to counsel's deficient advocacy, the . . . claim would not have been *procedurally defaulted* at the post-conviction trial proceeding because [Petitioner] retained

---

[4] The Court notes that the record lodged by Respondent is missing the page of Petitioner's second amended petition for post-conviction relief that would have included the bulk of his presentation of Ground 12 in state court. (See ECF No. 15-14, at 21–22.) Nevertheless, the Court finds that the claim was raised on post-conviction based on the portion of the claim in the record and Petitioner's acknowledgment in his pending Petition.

[5] With the exception of Ground 19, Petitioner acknowledges that these claims were not raised on post-conviction appeal. (ECF No. 1, at 10 (Ground 2), 36 (Ground 12), 42 (Ground 14), 48 (Ground 16), 52 (Ground 19).) Ground 19 actually presents 7 distinct claims of ineffective assistance of trial counsel, reflected in Respondent's categorization of claims as Claims 1(J) and 1(N)–(T) [Note: Respondent skipped the designation 1(Q)]. (ECF No. 1, at 54–55; ECF No. 20, 15 17–18.) The two claims under discussion here, designated by Respondent as 1(S) and 1(T), were not raised in Petitioner's appellate brief, though other claims presented in Ground 19 were. (ECF No. 14-18.)

the right to preserve the claim by appealing." *West v. Carpenter*, 790 F.3d at 699 (emphasis in original).

Petitioner defaulted these claims on post-conviction appeal, and has not established legal cause for that default. Accordingly, these claims will be dismissed as procedurally defaulted.

### 2. Unrepresentative jury pool (Petitioner's Ground 1)

Petitioner alleges that the "[j]ury pool did not represent an accurate cross section of the community" because all 127 potential jurors were Caucasian and he is Hispanic. (ECF No. 1, at 5.) Petitioner did not challenge the composition of the jury pool as a substantive issue on direct appeal, but exhausted a claim on post-conviction that his trial counsel was ineffective for not objecting to the composition of the jury pool. (ECF No. 15-18, at 15 (appellate brief asserting "Counsel failed to address the issue of the all-white jury pool while the Petitioner was from Hispanic descent").) Therefore, Respondent has liberally construed Petitioner's habeas petition to raise an ineffective-assistance claim in connection with the composition of the jury pool, and the Court will do the same.

The TCCA first summarized the standard of review it applied to Petitioner's ineffective-assistance claims:

> In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Vaughn* [*v. State*], 202 S.W.3d [106,] at 116 [(Tenn. 2006)] (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

> A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." *Id.* at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes ""a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 370 (quoting *Strickland*, 466 U.S. at 694).

"In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) (citing *Strickland*, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad*, 938 S.W.2d at 369).

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *8-9 (Tenn. Ct. Crim. App.

Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

The court then went on to reject this particular claim on the merits:

First, the Petitioner contends that trial counsel was ineffective for failing to object to the racial composition of the venire . . .. Specifically, the Petitioner complains that he is a Hispanic male who was charged with the homicide of a Caucasian female, and he was convicted by a biased jury. He argues that the outcome of trial could have been different if minorities had been included in the jury pool. The State responds that the Petitioner failed to establish a basis for a change of venue or that he was prejudiced during jury selection.

Both the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant the right to a trial by an impartial jury. "'The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'" *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (quoting *State v. Hugueley*, 185 S.W.3d 356, app. 390 (Tenn. 2006)). There is no constitutional guarantee requiring a person to be tried by a jury composed in whole or in part of his or her own race. *Harvey v. State*, 749 S.W.2d 478, 481 (Tenn.Crim.App.1987) (the mere fact that African–American petitioner was tried by twelve Caucasian jurors did not violate any right); *see also Wheeler v. State*, 539 S.W.2d 812, 815 (Tenn.Crim.App.1976)). To establish an improper jury venire, a defendant must demonstrate:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*State v. Hester*, 324 S.W.3d 1, 39 (Tenn. 2010) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). A petitioner will not prevail on a claim of ineffective

assistance of counsel based on deficient voir dire absent a showing of actual bias. *Smith*, 357 S.W.3d at 348 (citing *Dellinger v. State*, No. E2005–01485–CCA–R3–PD, 2007 WL 2428049, at *30 (Tenn.Crim.App. Aug. 28, 2007), *aff'd*, 279 S.W.3d 282 (Tenn. 2009)).

In denying relief based on this claim, the post-conviction court found that the Petitioner failed to present any proof of a systemic exclusion in the jury selection process. The court also found that the Petitioner failed to prove by clear and convincing evidence that there was an abridgement of a constitutional right in either the venire or the voir dire. The court specifically accredited the testimony of trial counsel that the Petitioner told counsel that he was white when directly asked. It further noted that trial counsel questioned the prospective jurors regarding whether they would have trouble rendering a fair verdict in a case involving a brown, Hispanic defendant and a white female victim. The post-conviction court concluded that there was no evidence in the record that any juror was prejudiced or biased.

We have reviewed the trial transcript of the jury selection phase and agree with the post-conviction court that the Petitioner failed to demonstrate prejudice based upon the composition of the venire. There was no evidence presented at the post-conviction hearing that the jury selection process in Smith County was unconstitutional. Moreover, the Petitioner did not present proof that the outcome of trial would have been different if there were minorities in the impaneled jury. Based on our review, we conclude that the record does not preponderate against the post-conviction court's finding that the Petitioner failed to establish either deficiency or prejudice in the jury selection process.

*Id.*, 2015 WL 5169318, at *9-10.

The Supreme Court has held that "a defendant has no right to a 'petit jury composed in whole or in part of persons of [the defendant's] own race,'" only "the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305 (1880)). Petitioner has not alleged that anything about the method of selection for the jury venire or the seated jury was discriminatory. His complaint is simply about the racial composition of the venire and jury, and his trial counsel's failure to object to that composition. (ECF No. 1, at 5; ECF No. 15-18, at 6.)

The TCCA correctly identified the proper standard for review of Petitioner's ineffective-assistance claims and applied it reasonably in concluding that there was no evidence of discrimination in the jury selection process, and therefore no prejudice arising from counsel's failure to object. It is impossible, therefore, for this Court to find that the TCCA's holding "was

so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," as required to grant relief under AEDPA's unreasonable-application prong. *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This claim will be dismissed.

### 3. Petitioner's statement (Petitioner's Ground 3)

Petitioner alleges that law enforcement agents interrogated him after he invoked his right to remain silent, and that the improperly extracted statement was used against him at trial. (ECF No. 1, at 12.) Petitioner never raised this issue as an independent *Miranda*[6] violation in state court, but he did allege at post-conviction that trial counsel was ineffective for failing to move to suppress his statement on this basis. (ECF No. 15-14, at 10.) Both Respondent and the Court therefore treat the current claim as one for ineffective assistance of trial counsel.

The TCCA rejected this claim on the merits:

Next, the Petitioner argues that trial counsel should have filed a motion to suppress his statement to Agent Locke. He asserts that his statement was illegally obtained based on the violation of his *Miranda* rights and his right to counsel. The State responds that the post-conviction court properly determined that the issue was a matter of trial strategy and that the Petitioner voluntarily waived his rights prior to his interview.

With regard to the Petitioner's statement to law enforcement, the post-conviction court found that counsel made the strategic decision not to suppress a statement that he considered to be exculpatory. The court noted that the Petitioner had consistently stated that the victim's death was accidental during his testimony at trial and on the night of the interview. The court found counsel's decision to include the statement to be reasonable given that it was arguably helpful and supported the theory of the defense. The post-conviction court concluded that the Petitioner did not meet his burden of proof on this claim by clear and convincing evidence.

We conclude that the Petitioner has failed to prove that trial counsel's performance was deficient in this regard. Trial counsel testified that he represented the Petitioner from the time of his arrest to the motion for new trial hearing. He stated that the Petitioner consistently denied shooting the victim. Counsel said that there was never a question that the Petitioner would testify at trial because he needed to tell his side of the story. According to trial counsel, the

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966) (requiring that a defendant be warned of his right to counsel and to remain silent before a custodial interrogation and holding that statements elicited in the absence of such warning or in violation of such rights are inadmissible in court).

Petitioner's statement to Agent Locke was consistent with the defense theory. Even after the Petitioner moved out of the state, he and counsel met multiple times to discuss the trial and the proof. Counsel believed that he had done everything he could in the Petitioner's case, and he did not recall the Petitioner ever complaining about the defense strategy. This court must be highly deferential to counsel's performance, *Burns*, 6 S.W.3d at 462, and we will not second-guess the informed tactical and strategic decisions of trial counsel. *Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008) (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). Here, the record reflects that trial counsel adequately prepared for trial and made an informed strategic decision to include the Petitioner's prior consistent statement in the evidence. Moreover, "'[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369). The Petitioner has not established that trial counsel's conduct fell below "an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Accordingly, he is not entitled to relief on this issue. FN3

> Footnote 3
>
> Because the Petitioner has made an insufficient showing of deficiency, we need not address the issue of prejudice. See *Goad*, 938 S.W.2d at 370 (citing *Strickland*, 466 U.S. at 697). Nevertheless, we note that the Petitioner failed to demonstrate prejudice from counsel's failure to file a motion to suppress his statement. The record reflects that the Petitioner signed a Miranda waiver prior to providing a statement to law enforcement. At the post-conviction hearing, the Petitioner acknowledged that the majority of his interview was conducted after he signed the waiver. Moreover, Agent Locke testified that the Petitioner was cooperative and voluntarily provided information during the interview. Therefore, the Petitioner has not established a reasonable probability that the motion to suppress would have been successful.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *10 (Tenn. Ct. Crim. App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

The agent who took the statement testified that he advised Petitioner of his *Miranda* rights, and that Petitioner voluntarily consented to talk to him. (ECF No. 15-3, at 118–119.) The agent's report indicates that Petitioner signed a waiver at 10:05 p.m., and that the oral interview began at that point. (ECF No. 15-7, at 2.) Petitioner has acknowledged that he signed a formal waiver at 10:05 that night, after just a "little bit" of questioning, and that most of his statement was given after signing the waiver. (ECF No. 15-16, at 55–56; ECF No. 15-17, at 3.) In the

statement, Petitioner denied shooting the victim, and said that he, the victim and their son all fell to the floor, and he did not know how the victim was shot in the course of the fall. (ECF No. 15-3, at 91–97; ECF No. 15-7, at 2–5.) Trial counsel actually relied on the statement in evidence – "they fell, doesn't know what happened" – in his argument in support of his motion for acquittal on the charge of first degree murder after the close of the prosecution's proof. (ECF No. 15-4, at 15–16.) The statement was consistent with Petitioner's later testimony at trial with regard to the fall and his not knowing how the victim wound up being shot. (ECF No. 15-4, at 53–54.) On cross-examination, the prosecutor referenced the statement only once, and did not raise any points of contradiction between the statement and Petitioner's testimony. (ECF No. 15-4, at 78.) Petitioner's trial counsel argued in closing that Petitioner's cooperation in giving the statement and the consistency of his statement with his testimony were indications of his innocence. (ECF No. 15-5, at 16–17, 20–21.) Even at the post-conviction hearing, one of Petitioner's points of emphasis was that "I have always denied firing the gun, said I never touched it." (ECF No. 15-16, at 40.)

When asked at the post-conviction hearing about his decision not to move to suppress the statement, trial counsel responded "There was no need to suppress the statement. It was exculpatory." (ECF No. 15-16, at 106.) He went on to observe that the statement was to the effect that Petitioner "didn't do it," that it was "essentially the same story that he told at trial," and that his strategic decision was not to "fight[] about something that doesn't matter." (ECF No. 15-16, at 107.)

Counsel's decision did not fall below an objective standard of reasonableness. Moreover, given that both counsel and Petitioner have subsequently relied upon the statement as proof of his innocence, he has not demonstrated that he was prejudiced by its admission. After correctly identifying the applicable federal standard and summarizing the relevant evidence, the state court reasonably found that Petitioner had not demonstrated either deficient

performance or prejudice in connection with counsel's decision not to seek suppression of the statement. This claim will be denied on its merits.

### 4. Sander (Petitioner's Ground 5)

Petitioner alleges that a sander introduced at trial should not have been admitted because its discovery was the result of a search that exceeded the scope of the search warrant, and that his attorney was therefore ineffective for failing to challenge the admissibility of this evidence. (ECF No. 1, at 16.) Petitioner, his trial counsel and the agent who discovered the sander all testified about this claim at the post-conviction hearing, after which the trial court denied relief and the TCCA affirmed:

> The Petitioner's next claim concerns the introduction of the sander into evidence at trial. In his brief, he argues that because trial counsel testified that he had no recollection regarding the sander, the post-conviction court improperly determined that counsel provided effective assistance on this issue. The State responds that despite counsel's lack of recollection of events occurring thirteen years before, it is incumbent upon the Petitioner to prove deficient performance and resulting prejudice. We conclude that the Petitioner has not established prejudice based on counsel's alleged deficiency.

> At the post-conviction hearing, the Petitioner alleged that the sander was inadmissible as evidence at trial because it was seized from his neighbor's property, which exceeded the scope of the search warrant. He testified that this illegally obtained evidence was used at trial to support the State's allegation that he removed the serial numbers from the revolver that was found at the crime scene. Trial counsel testified that although he could not recall the sander, it was his usual practice to review the validity of search warrants. Agent Locke testified that he recovered a Milwaukee heavy duty sander as a result of the execution of a search warrant at the Petitioner's property on October 15, 1999. In rejecting this claim for relief, the post-conviction court noted in its oral findings that the search warrant specifically authorized the recovery of evidence of tools used to remove serial numbers. The court concluded that "there [wa]s no showing of prejudice in this case with regard to the lack of objections or suggestions with regard to suppression[.]"

> We agree with the post-conviction court's conclusion that trial counsel was not ineffective in this regard. Specifically, the Petitioner has failed to present any proof or argument that but for counsel's failure to object to the admission of the sander, the outcome of the proceeding would have been different. We note that there were fifty exhibits introduced at trial, including the autopsy report which reflected that the cause of the victim's death was a gunshot wound inflicted when the barrel was pressed to her head. The physical evidence also established that the victim was shot with a 9 mm pistol, a weapon which the Petitioner admittedly possessed. Ownership of the .38 caliber revolver could not be determined

because the serial number had been removed. The State further built its case against the Petitioner by introducing evidence of the bitter divorce proceedings between the spouses, the fact that the victim reported the Petitioner's theft to police in August 1999, and proof that the victim was awarded custody of the couple's son shortly before her death. On direct examination, trial counsel asked the Petitioner about the sander, and the Petitioner responded that he had borrowed the tool from a friend who lived in Ashland City. The Petitioner denied using the sander to remove the serial number from the .38 revolver. In sum, given the overwhelming evidence of guilt and the Petitioner's admission that he possessed the sander, the Petitioner has failed to show that he was prejudiced by counsel's decision not to object to the evidence. Therefore, this claim is without merit.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *11 (Tenn. Ct. Crim. App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

In addition to the state court's rationale, because Petitioner did not own the sander (see ECF No. 15-4, at 354) or, according to him, occupy the property from which it was recovered (see ECF No. 15-16, at 24–25), it is possible that he lacked standing to move to suppress. *See United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v. Davis*, 430 F.3d 345, 359–60 (6th Cir. 2005)) ("In cases involving Fourth Amendment violations, we determine standing by deciding whether a defendant can establish a legitimate expectation of privacy in the area searched or the items seized."); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544 (6th Cir. 2003) (landlord does not have standing to challenge search of leased property); *State v. Talley*, 307 S.W.3d 723, 731 (Tenn. 2010) (listing ownership of the item seized and of the place searched as two of seven factors used to determine standing to challenge a search); *State v. Smith*, 656 S.W.2d 882, 887 (Tenn. Ct. Crim. App. 1983) ("The general rule is that a tenant, not the landlord, has the expectation of privacy in leased premises[.]").  The lack of an objection or motion that a defendant lacks standing to make is not likely to affect the outcome of a trial.  Accordingly, it was not unreasonable for the state court to conclude that Petitioner had not established that he was prejudiced by counsel's failure to challenge the admission of the sander.  This claim will be denied on its merits.

### 5. 911 recording (Petitioner's Ground Eight)

Petitioner has exhausted a claim that trial counsel's performance was deficient with regard to the handling of a 911 recording that was entered into evidence at trial. The TCCA affirmed denial of relief on this claim:

> The Petitioner contends that trial counsel should have objected to or addressed the gaps in the 911 recording. He argues that the issue "could have been confusing to the jury" and that the State's explanation at the post-conviction hearing "d[id] not repair the possible prejudice to the [Petitioner] at trial." The State responds that the Petitioner presented no proof of exculpatory evidence in the recording and therefore failed to establish prejudice.
>
> At the post-conviction hearing, the Petitioner alleged that the recording of his 911 call had been altered to support the State's theory that he had staged the crime scene. Trial counsel testified that he had listened to the recording multiple times and could not recall any gaps in the tape. Agent Locke explained that 911 recordings typically included pauses because calls were recorded on separate tracks, and dispatchers often respond to many events at the same time. The post-conviction court found no prejudice or evidence to support the Petitioner's allegation that the tape had been altered:
>
>> The 911 tape, in this courtroom here today, I think it was clearly explained why there could be a gap, and indeed, what's the prejudice? Is there something that Mr. Medina said that has been missing on this particular tape? I heard him say nothing to that extent, that he said something or other people said something that was exculpatory or that would help him in some form or fashion. There's been no proof in the record that this gap in the tape contains something that he said; there's been no proof that he has produced here to show clearly and convincingly that [trial counsel] was inadequate in his representation because of certain missing contents, and I think the State has adequately explained, if you want to even call it a gap to that tape.
>
> We agree with the post-conviction court that the Petitioner has failed to show that trial counsel was ineffective regarding the 911 recording. Specifically, the Petitioner has not demonstrated how he was prejudiced by counsel's failure to object to the gaps in the tape. Apart from his allegation that the 911 recording was altered and did not record the entire event, the Petitioner failed to support his claim with any evidence. At the post-conviction hearing, he did not present any proof to establish a reasonable probability that counsel's objections to the recording would have resulted in a different outcome. Accordingly, the Petitioner is not entitled to relief on this issue.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *13 (Tenn. Ct. Crim. App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

Petitioner testified at post-conviction that his reason for claiming that the 911 recording had been altered was a discrepancy between the length of the tape and other law enforcement logs recording the time of certain events, including the arrival of law enforcement personnel on the scene.[7] (ECF No. 15-16, 66–68.)  He acknowledged, however, that he was not familiar with the different procedures officials followed in logging the time of events. (ECF No. 15-16, at 67–68.)  Moreover, neither his testimony at the post-conviction hearing on this claim nor his submission to this Court (ECF No. 1, at 24) indicates how he was prejudiced by either the admission of the tape or the absence of the allegedly missing portions of the tape.  Petitioner has therefore not established any basis for finding that the state court's conclusion was unreasonable.  This claim will be denied on its merits.

### 6.  Towel at crime scene (Petitioner's Ground 11)

Petitioner alleges that trial counsel was ineffective for failing to challenge allegedly planted evidence.  Specifically, Petitioner complains about a towel that appears on the floor near his wife's body in a crime scene photo, despite not being depicted in two diagrams created by officials who responded to the scene.  The TCCA affirmed denial of relief on this claim:

> The Petitioner further asserts that trial counsel failed to question witnesses about a towel that he believed had been planted next to his wife's body by law enforcement. The Petitioner bases his claim on the fact that two diagrams of the crime scene submitted by EMT Mark Manning and TBI Special Agent Roy Copeland did not depict a towel in the area. However, crime scene photographs showed a towel next to the victim. The State responds that the post-conviction court examined the exhibits and properly concluded that the diagrams were merely illustrative and that there was no evidence of prejudice.
>
> At the post-conviction hearing, the Petitioner maintained that law enforcement placed a towel next to the victim's body to bolster the theory that the Petitioner had wiped the fingerprints off the weapons. However, the Petitioner conceded that EMT Mark Manning testified that photographs were more accurate because his diagram did not include everything that was at the crime scene. At trial,

---

[7] The Court notes that it has been unable to review the recording of the 911 call, because Respondent did not include it in the state court record submitted to this Court.  Although the recording was apparently played at the preliminary hearing in Petitioner's prosecution, the recording of that hearing itself (see ECF No. 19) is of such poor quality due to technical issues (i.e. overlapping tracks) that the relevant portion is inaudible.  While the Court does not favor the practice of omitting evidence relevant to a petitioner's claim from the record, it finds that review of the recording is not necessary for the disposition of this claim.

Manning stated that his diagram "was just a real quick sketch" and that it was not meant to have evidentiary value. In dismissing this claim, the post-conviction court found that the State had adequately explained the discrepancy between the diagrams and the photographs. The court noted that there were other items which were depicted in one exhibit but left out of the other. The court found no proof of prejudice based on counsel's failure to ask about the lack of a towel in the diagrams. We conclude that the record does not preponderate against the post-conviction court's findings, and the Petitioner is not entitled to relief on this claim.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *13 (Tenn. Ct. Crim. App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

All of the photographs and one of the diagrams in question are in the record before this Court (ECF No. 15-7, at 37, 39, 41, 52), while Copeland's diagram – trial exhibit 22 – is not.[8] (See ECF No. 15-7, at 1 (indicating several exhibits not submitted, including Exhibit 22).) In addition to the towel, the photographs reflect quite a few items at the scene that were not included in the diagram in the record, presumably because they weren't considered significant to the investigation: a dust pan and brush under the baby high chair (compare ECF No. 15-7, at 39 and 52 with ECF No. 15-7, at 41); a cord dangling onto the floor from a nearby cabinet (compare ECF No. 15-7, at 37 with ECF No. 15-7 at 41); and even a chair that is just beside a pager that is depicted on the diagram. (Compare ECF No. 15-7, at 37 with ECF No. 15-7, at 41.)

The state court correctly summarized the testimony of the creators of the diagrams about the accuracy of the photos as compared to the diagrams (ECF No. 15-3, at 73–74, 77, 414-15), and Petitioner has not offered any reason to conclude that their testimony would have been different if the towel had specifically been referenced. Moreover, neither the prosecutor nor any of the witnesses at trial made any mention of the towel in the photos or placed any significance on the towel as evidence in the case. A prosecution witness testified that "[n]o known prints developed on either weapon" (ECF No. 15-3, at 111), and the prosecutor asked Petitioner on cross-examination why he had "wipe[d] the prints off the two weapons," which

---

[8] Again, although the Court does not condone Respondent's failure to include portions of the record that are directly related to Petitioner's claims, there is no dispute that the towel is not represented on Copeland's diagram, so review of the diagram is not necessary to address this claim.

Petitioner denied having done. (ECF No. 15-4, at 79.) When the prosecutor argued during closing that Petitioner had wiped prints off the guns, he said that Petitioner had probably used a towel like the one he had (inexplicably) held while he testified. (ECF No. 15-4, at 154, 159–60.) He never referenced the towel in the photos or suggested in any way that Petitioner had used it in the commission of his crime or its cover-up. And finally, any argument that law enforcement agents had reason to "plant" the towel on the scene falls flat in light of the fact that the lack of identifiable prints on either gun was only discovered after the guns were sent to a crime lab for examination, along with prints from Petitioner and the victim – long after the crime scene photos were taken. (ECF No. 15-4, at 256, 282.)

Accordingly, it was reasonable for the state court to conclude that Petitioner had not established that he suffered any prejudice from trial counsel's inaction with regard to the towel in the crime scene photos. This claim will be denied on its merits.

### 7. Tape recorder (Petitioner's Ground 13)

Petitioner alleges that trial counsel was ineffective for failing to pursue a theory that the prosecution withheld an audio recording that would have established that the victim entered his home and made him turn off a recorder he was using to tape their conversations on the advice of his divorce attorney. He asserts that police "surely would have taken" the recording before he returned to his home 14 days after the murder (ECF No. 1, at 38), but that only a photograph of the recorder and tape entered evidence at trial, and that his trial counsel abandoned questioning about the recording during trial. Petitioner exhausted this claim on post-conviction, and the TCCA affirmed the finding that it was without merit:

> Next, the Petitioner contends that counsel erred in "not asking about or seeking to introduce a tape player" at trial. In his second amended petition, the Petitioner alleges that trial counsel "abandoned all questioning of T.B.I. Agent Jason Locke regarding the audiotape that was playing at the time the victim arrived at the Petitioner's residence." The State argues that there is no evidence of prejudice in this claim.
>
> In dismissing this ground for relief, the post-conviction court stated as follows:

> Mr. Medina, in his petition, says, well, there was a tape recording of these events. Nothing was taken the night of this event. Photographs were taken. Later on, nothing on the return shows a cassette recording. I wonder as I see this on this Officer's return and the inventory, I wonder, well, when Mr. Medina returned to the residence, it must still have been there in the house. There's no suggestion—and where is the prejudice here?
>
> Again, the test is also has he been prejudiced by all of this lack of effective assistance of counsel. There's no showing on those particular issues.

We agree with the post-conviction court that the Petitioner has failed to demonstrate prejudice arising from counsel's performance in this regard. At the evidentiary hearing, Agent Locke testified that the State never collected a tape recorder or cassette tape on the night of the shooting or after executing the search warrant later in October 1999. Agent Locke said that there was no evidentiary value in the device since it was photographed but not seized. The Petitioner testified consistently at trial and at the post-conviction hearing that on the evening of the shooting, he turned off the tape recorder after his wife became angry. Therefore, the Petitioner's own testimony supports the conclusion that there was no value in this evidence. Accordingly, he has not established a reasonable probability that but for counsel's alleged errors regarding the tape recorder, the outcome of the proceeding would have been different. This issue lacks merit.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *12 (Tenn. Ct. Crim. App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

Chronologically, the first mention in the state record of any recording Petitioner made of the victim is in his statement the night of the murder, when he told Agent Locke that at times when he visited his son in the hospital, "Jennifer would make a scene. I have it on tape." (ECF No. 15-7, at 4.) Trial counsel asked Agent Locke on cross-examination at trial about whether Petitioner had told him anything about a discussion with the victim about any recording on the day of her death, and Agent Locke said no:

Q.  Did he tell you anything about when Jennifer got there that there was some talk about a tape recorder and whether their conversation was being taped?

A.  He told me that he had had some tape recorded conversations and I don't recall specifically if it was – it was not of that night, or at least I did not take it to mean that night. My understanding was that he recorded conversations they had at Vanderbilt Hospital.

> Q. Did he tell you anything, to the best of your recollection, that when she got there that night she asked, are you taping this conversation and made him open the tape recorder and flip out the tape?
>
> A. He did not say that, no.
>
> Q. He didn't say it or you don't recall it?
>
> A. He didn't say it and I don't recall it being said. Had he said that we would have recovered that tape, that cassette recorder.

(ECF No. 15-3, at 125.)

Petitioner later testified about the recorder, explaining generally "I have always taped all the conversation every time she come over so I wouldn't have any problems," and "I had a microphone and a recording going all the time." (ECF No. 15-4, at 37–38.) Specifically about the date of the murder, Petitioner testified as follows:

> Q. Did you have a microphone and recording going this day?
>
> A. The microphone was installed in the t.v. but when I got home I went to my safe, you know, when she got ready to come over. I got the tape recorder out, it had a tape in it, and like I said I was getting Austin's stuff ready and I set the tape on that table right there.
>
> * * * *
>
> Q. I'll show you what's been marked exhibit 42 and ask if you can identify that?
>
> A. Yes, that's my tape recorder with a tape that was in it that played the whole conversation for the hour or so that the home health care nurse was there that Friday before.
>
> * * * *
>
> Q. And she had asked you about the conversation being taped?
>
> A. Yes, when she seen the tape recorder.
>
> Q. What was your response?
>
> A. I told her it wasn't on.
>
> Q. Did she make you prove it?
>
> A. Yes.
>
> Q. How?
>
> A. She told me to turn the fucking thing off, to be honest with you, so I went ahead and hit eject and showed her that it wasn't playing.

(ECF No. 15-4, at 38–39.)

The record thus indicates that as late as his trial testimony, Petitioner had never mentioned having actually recorded the beginning of his encounter with the victim on the day she died. His testimony was to the effect that it was his habit to record her, but that on that date he was busy "getting Austin's stuff ready" and simply "set the tape on that table." He told the victim the recorder was not on and proved it by ejecting the tape. Notably, he did not testify at trial that he had turned on the recorder or that he had to turn it off before ejecting the tape. It was not until the post-conviction hearing that Petitioner testified that on the day of the murder "I had the tape recorder on" and that "she got very angry and she made me shut the thing off." (ECF No. 15-16, at 26.) Accordingly, Petitioner has not demonstrated that trial counsel performed deficiently by failing to pursue a theory that did not appear from the facts as they existed at the time of trial.

Moreover, Petitioner has not established the evidentiary value of the short length of time he now alleges the recorder ran before the victim made him turn it off (see ECF No. 15-4, at 63 (Petitioner's testimony that "the first thing she said was about the tape recorder")), or how he was prejudiced by the absence of that evidence at trial. As the Court sees it, the only possible value of the recording would be to suggest that the victim was somehow exerting her own will at the beginning of her encounter with Petitioner. However, Petitioner already managed to do that by testifying that she caused him to eject the tape, as seen in a photo admitted at trial.

The state court's rejection of this claim was not unreasonable, and it will be denied on its merits.

### 8. Failure to Interview and Call Witnesses and Prepare for Trial (Petitioner's Grounds 15 and 19)

Petitioner complains that trial counsel failed to interview and call several witnesses to testify and generally failed to prepare for trial because he expected to withdraw from the case. (ECF No. 1, at 54–55.) Specifically, he alleges that counsel was ineffective for failing to interview and subpoena former Smith County Detective Danny Williams regarding his "major

role" in several aspects of the investigation, and that he "was informed later that Detective Danny Williams was terminated from the Smith County Sheriff's Department for stealing and fabricating evidence on crime scenes." (ECF No. 1, at 44, 55.) He further alleges that counsel was ineffective for failing to interview or subpoena witnesses, including neighbors and his divorce attorney, who would have testified about the victim's violent nature, and failing to call neighbor Leann Whitfield about the quantity of medical supplies that the victim would have had to carry home with her son the day she died.[9] (ECF No. 1, at 55.)

The post-conviction court denied relief on these claims, and the TCCA rejected them as a whole:

> The Petitioner also argues that trial counsel was ineffective for failing to subpoena Detective Danny Williams to testify at trial and for failing to re-examine TBI Special Agent Roy Copeland. According to the Petitioner, Detective Williams "played a major role in the investigation of [his] case" and should have been called as a witness. He asserts that members of law enforcement could have testified regarding how they processed the crime scene, including the collection of fingerprints and the photographs taken at the scene. The State responds that the Petitioner failed to prove either deficiency or prejudice.
>
> Regarding trial counsel's failure to call several witnesses, the post-conviction court concluded that counsel's performance was not deficient. The court noted that counsel had practiced law for over thirty years and had experience with numerous murder trials. The court accredited trial counsel's testimony regarding his thorough pretrial preparation, his review of discovery materials, and his method of preparing a detailed trial notebook. The post-conviction court found that counsel was "well prepared" and had made tactical decisions regarding witnesses. With regard to the examination of witnesses, the court noted that counsel made reasonable decisions and questioned witnesses consistently with the defense theory instead of asking everything that the Petitioner wanted.
>
> The record does not preponderate against the post-conviction court's findings on this issue. At the evidentiary hearing, trial counsel testified extensively regarding his preparation both before and during trial. He said that it was his practice to confer with clients about which witnesses to call and the questions to ask. Counsel said that he did not call witnesses if their testimony would harm the defense. He did not recall the Petitioner ever complaining about the witnesses

---

[9] Respondent maintains that these claims, which he designates 1P and 1R, are procedurally defaulted because they were not raised on post-conviction appeal. (ECF No. 20, at 18–19.) However, Petitioner's state appellate brief refers generically to the failure to call "certain witnesses" without mentioning any by name (ECF No. 15-18, at 16), and the TCCA decision also mentions the "failure to call several witness," despite only referencing Danny Williams by name. Accordingly, the Court treats all of these claims as exhausted.

who were interviewed and subpoenaed. We conclude that trial counsel adequately prepared for trial and made tactical decisions regarding witnesses.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *11–12 (Tenn. Ct. Crim. App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

Petitioner has not pointed to any aspect of this ruling as erroneous or explained how it could be deemed unreasonable. Petitioner testified at post-conviction that he expected Williams to testify at trial and was surprised that he did not. (ECF No. 15-16, at 42–43.)

But counsel testified that he and Petitioner discussed witnesses, and that to his knowledge he "had everybody lined up that Mr. Medina wanted," and that Petitioner "raised no issue about any witnesses." (ECF No. 15-16, at 88–89.) Counsel recounted that he interviewed several witnesses in Smith County, including people at the sheriff's department and police department, and that he had a trial notebook containing information on every witness he planned to call, which Petitioner could have seen during trial. (*Id.*) On cross-examination, counsel elaborated about his witness interviews and decisions about who should testify:

> Q: And in this case, do you recall the defendant telling you that he wanted you to go interview certain witnesses?
>
> A. I don't have any specific recollection about any specific witness, but to my knowledge, I talked to everybody that he wanted me to talk to. Now, whether I used them or not, that's trial tactics and strategies. You know, you've got to weigh the good and the bad with witnesses. They may know a little something good and a whole lot bad. Well, it's not worth getting that little bit of good for that whole lot of bad.
>
> Q. Yes, sir. Did Mr. Medina express any dissatisfaction with you prior to the trial about not interviewing particular witnesses?
>
> A. No, sir.
>
> Q. You go to trial and you have the witness list there on the table.
>
> A. Yes, sir.
>
> Q. And Mr. Medina sees that list.
>
> A. It was there for him to see.
>
> Q. And did he say why isn't so and so on the list or something of that nature, to your recollection?

> A. I have no recollection whatsoever of him making any complaint about either my wanting to use a certain witness or not wanting to use a certain witness.

(ECF No. 15-16, at 100–01.) Given the conflict between the testimonies of Petitioner and his counsel, it was not unreasonable for the state court to credit counsel's account of the witness selection for trial and to conclude that counsel's performance was not deficient. Moreover, although this does not appear to have been observed on post-conviction, both the prosecutor and Petitioner's counsel read their lists of potential witnesses at the beginning of voir dire, with Petitioner presumably sitting in the courtroom. (ECF No. 15-2, at 11.) Neither Danny Williams, Leann Whitfield nor Petitioner's divorce attorney were on either list, so Petitioner should not have been surprised later by the fact that they did not testify.

The state court's rejection of this claim was not unreasonable, and it will be denied on the merits.

### 9. Self-Defense instruction (Petitioner's Ground 17)

Petitioner claims that trial counsel was ineffective for not objecting to the trial court's instructing the jury on the theory of self-defense, when he had never claimed self-defense and consistently denied that he fired his gun. (ECF No. 1, at 50.) He exhausted this claim in state court, where the TCCA rejected it:

> Finally, the Petitioner argues that trial counsel was ineffective for failing to object to the trial court giving a jury instruction on self-defense. In his second amended petition, the Petitioner contends that counsel was aware that he had never relied on a defense of self-defense and that he had always denied firing a weapon. The State responds that the proof presented at trial warranted a self-defense instruction and therefore counsel was not ineffective in this regard.

> It is well-settled that a criminal defendant is entitled to an instruction on every issue raised by the evidence. *See Myers v. State*, 185 Tenn. 264, 206 S.W.2d 30, 31–32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence). A trial court is obligated to give the jury a complete charge on the law applicable to the facts of the case, and a failure to do so may constitute reversible error even where a defendant has not requested the instruction. *See Poe v. State*, 212 Tenn. 413, 370 S.W.2d 488, 489 (Tenn. 1963). Significantly, a self-defense instruction may be charged even where a defendant claimed that the homicide was an accident. *See Myers*, 185 Tenn. at 268, 206 S.W.2d at 31 (citing *State v. Stevens*, 96 Mo. 637, 10 S.W.

172 (Mo. 1888)). "The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39–11–203(c).

At the time of the Petitioner's offense, the self-defense statute provided, in pertinent part:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

T.C.A § 39–11–611(a) (1999). At trial, the Petitioner testified that the victim was armed with a revolver on the day of the shooting. He stated that he became scared after he saw the weapon hidden in the sofa, and he retrieved his gun from the bedroom safe. He said he was afraid and did not know what to do when the victim started losing control. According to the Petitioner, the victim aimed the revolver at him while he was holding their son. At one point, the Petitioner testified that the victim "grabbed the gun and [he] could see it in her face she was going to shoot [him]." He said that he grabbed the victim and pushed her, and they fell to the ground with their son. The Petitioner called 911 after the victim did not get up.

The trial transcript reflects that during a discussion about the jury charge, the trial court raised the issue of self-defense over the objection of the State. The State argued that the Petitioner never claimed self-defense and had testified that he never removed his weapon from his back pocket. Trial counsel argued that the self-defense charge should be submitted for the jury's consideration. The trial court reasoned as follows regarding this jury instruction:

> You don't plead not guilty by reason of self-defense. You just plead not guilty and let the case set all the facts. And here we have a person assaulted, or using force, for someone to create in that person's mind a reasonable belief that they're in imminent or actual danger then that person is justified in doing certain things, that's what the charge says. I think it follows, from what was said about getting the gun, putting it in his pocket, why he did it, that type of thing—I'm not saying the jury is going to buy it, I'm not saying I'd buy it, but I'm saying theoretically under the law all of that is applied. And I believe if I don't charge it, I think it would be error, ... and it would have to be tried again even if he got a conviction.

With respect to this claim, the post-conviction court determined that the evidence at trial raised an inference that the Petitioner had feared for his life. The court noted that every trial judge is obligated, even if reluctantly, to instruct the jury based on issues raised in the proof. The post-conviction court concluded that it

would have been error for the trial court not to provide the self-defense jury instruction given the evidence presented at trial.

We conclude that the Petitioner has failed to establish either deficiency or prejudice arising therefrom based on the self-defense instruction. The trial court, finding the issue of self-defense had been fairly raised, instructed the jury on this theory. The jury heard the Petitioner's testimony that the shooting was accidental and, by its verdict, did not credit the Petitioner's testimony or that he had acted in self-defense. The Petitioner has not proven by clear and convincing evidence that counsel was deficient in not objecting to the self-defense charge. Moreover, the Petitioner has not presented any evidence of prejudice based on this alleged deficiency. We discern no reasonable probability that the jury verdict would have been different if the jury had not been instructed regarding self-defense. This issue is without merit.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *14–15 (Tenn. Ct. Crim.

App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

Petitioner has not cited any federal law to which the state court's decision is contrary, or

pointed to any way in which the decision is unreasonable. He simply reiterates that he did not

claim self-defense, but does not dispute that state law requires instructions on all possible

defenses suggested by the facts of the case. He also does not address whether or how the

instruction affected the outcome of his case, or why the Court should conclude that his

counsel's objection would have been any more effective than the prosecutor's.

Petitioner has not established that he is entitled to relief on this claim under § 2254(d),

and it will be denied on the merits.

### 10. Change of venue (Petitioner's Ground 19)

Petitioner alleges that trial counsel was ineffective for failing to request a change of

venue after expressing doubts about the likelihood of receiving a fair trial in Smith County. (ECF

No. 1, at 54.) Petitioner exhausted this claim on post-conviction, and the TCCA rejected it:

The Petitioner's assertion that trial counsel was ineffective for failing to request a change of venue also lacks merit. A change in venue can be granted upon a showing of undue excitement or any other cause that is likely to result in an unfair trial. See Tenn. R. Crim. P. 21. However, the failure to seek a change in venue will not establish ineffective assistance of counsel absent a showing of prejudice. *Adkins v. State*, 911 S.W.2d 334, 337 (Tenn. Ct. Crim. App. 1994). Trial counsel testified that he did not believe there was a basis for a change of venue. The record reflects that the prospective jurors were questioned about

36

their knowledge of the Petitioner and the case, and the majority of them indicated that they had no prior exposure. We note that the Petitioner has presented no evidence that the failure to seek a change of venue was prejudicial to his defense or that the trial court would have granted the request. Accordingly, we conclude that trial counsel was not ineffective for failing to . . . request a change of venue.

*Medina v. State*, No. M201400561CCAR3PC, 2015 WL 5169318, at *10 (Tenn. Ct. Crim. App. Sept. 2, 2015), *appeal denied* (Dec. 11, 2015).

Tennessee law concerning change of venue is that "[p]rospective jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn. 1991). The test is 'whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity.'" *State v. Kyger*, 787 S.W.2d 13, 18–19 (Tenn. Ct. Crim. App.1989)." *State v. Crenshaw*, 64 S.W.3d 374, 386 (Tenn. Ct. Crim. App. 2001).

Petitioner does not allege any basis on which he believes trial counsel should have moved for change of venue. He does not allege that there was pervasive publicity in Smith County about his case, or any publicity at all. Of the entire venire, only two jurors had heard anything about the case, and their sources were a coworker who took the 911 call and a police scanner. Both jurors indicated that they would be able to put aside what they had heard and render a fair decision based on the evidence in the case (ECF 15-2, at 13–14, 51, 56–58), and Petitioner has presented no reason to believe otherwise. Accordingly, the trial court's rejection of this claim was not unreasonable, and the claim will be denied on the merits.

### B.     Claims 2–6

Respondent asserts, and Petitioner acknowledges, that these claims were not exhausted in state court. None of these claims was raised on direct appeal. (ECF No. 15-8, at 2.) Although they were raised in Petitioner's second amended petition for post-conviction relief (ECF No. 15-14, at 11–16, 17–20), they were not raised on appeal from denial of post-conviction relief. (ECF No. 15-18.)

Petitioner attributes this lack of exhaustion to failures of post-conviction counsel. (See, e.g., ECF No. 1, at 15.) However, the claims in question are not ineffective-assistance-of-trial-counsel claims. Accordingly, Petitioner cannot establish cause for default by demonstrating that post-conviction counsel was ineffective in his handling of these claims, despite the narrow window opened by *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). The law in this circuit is perfectly clear that the application of *Martinez* is strictly limited to claims of ineffective assistance of trial counsel:

> We will assume that the Supreme Court meant exactly what it wrote: "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true *except* as to initial-review collateral proceedings for claims of ineffective assistance of counsel *at trial*." [*Martinez*, 132 S. Ct.] at 1316 (emphasis added).

*Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013), *cert. denied sub nom. Hodges v. Carpenter*, 135 S. Ct. 1545 (2015), *reh'g denied*, 135 S. Ct. 2345 (2015). Moreover, as noted above, a claim that is raised at post-conviction but not included in the appeal from denial of relief is defaulted. *Wallace v. Sexton*, 570 F. App'x 443, 453 (6th Cir. 2014).

Claims 2 through 6 will be dismissed as procedurally defaulted.

## VII. CONCLUSION

For the reasons set forth above, the petition for the writ of habeas corpus will be denied, and this case will be dismissed.

An appropriate Order shall enter.

Kevin H. Sharp, Chief Judge
United States District Court